**UNITED STATES of America,**
**Plaintiff,**

v.

**Gustavo AGUILERA, Defendant.**

**No. CR S-03-0136 FCD.**

United States District Court,
E.D. California.

Sept. 25, 2003.

2

Richard Bender, United States Attorney, Sacramento, CA, for Plaintiff.

Quin Denvir, Carolyn Wiggin, Federal Defender, Sacramento, CA, for Defendant.

*AMENDED MEMORANDUM AND ORDER* [1]

DAMRELL, District Judge.

Defendant Gustavo Aguilera ("defendant" or "Aguilera") is charged with possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d). This matter is before the court on defendant's motion to suppress the introduction of a 20–gauge, Harrington and Richardson shotgun into evidence. The court heard oral argument on August 25, 2003.

1. The court issues this amended version of a Memorandum and Order, filed August 22, 2003, solely for purposes of publication. The changes have no substantive effect on the disposition of the underlying motion.

## BACKGROUND

Defendant was arrested after he entered the grounds of Franklin High School ("Franklin") in Stockton, California, with a concealed "sawed-off" shotgun. Franklin is an urban public high school with a population of approximately 2,800 students. (Decl. of Dorcas Alimbini ("Alimbini Decl.") ¶ 1.) Although the typical school day ends at 2:01 p.m., various tutoring classes and sports activities take place after school and, as a result, at least several hundred students remain on campus after each school day ends. (*See* Alimbini Decl. ¶ 6.) [2]

On March 5, 2003, at approximately 2:10 p.m., Franklin secretary Michelle Guiterrez ("Guiterrez") received a phone call from a woman identifying herself as a "parent" of a Franklin student. (Decl. of Michelle Guiterrez ("Guiterrez Decl.") ¶ 3; Rep. Tr. 8:23–25; 9:1–3.) The caller expressed "concern" that an armed individual was entering the campus but declined to disclose her identity. (Rep. Tr. 9:5–8.) According to the caller, she was sitting in her car near a side entrance of the school when she saw a group of young men pass close to her car on their way into the campus. (Guiterrez Decl. ¶ 3; Rep. Tr. 8:23–25; 9:1–3.) The caller reported observing one of the young men lift his t-shirt above his waist to reveal a "weapon" tucked into his shorts. (*Id.* ¶¶ 3–4; Rep. Tr. 8:23–25; 9:1–3.) According to Guiterrez, the concerned parent proceeded to describe the clothing of the young men entering the campus and specifically indicated that the defendant was a short, Hispanic male wearing dark shorts and a dark shirt. (Guiterrez Decl. ¶¶ 3–4; Rep. Tr. 8:23–25; 9:1–3.)

As the caller described her observations of defendant and his companions over the phone, Guiterrez, in turn, began to relay the information to Franklin Principal Patricia Hague ("Hague"). (*Id.* ¶ 7; Rep. Tr. 12:2–3.) The caller was requested to remain on the line with Guiterrez in order to provide updates on the group's location on campus until they were out of her view. (Guiterrez Decl. ¶ 7.) The caller agreed and told Guiterrez that defendant and his companions were walking past the tennis courts and headed behind the school gym. (Rep. Tr. 11:22–25.) The caller continued to update the group's position until her view was obscured by the school gym. (Rep. Tr. 12:8–11.) Shortly thereafter, Guiterrez assured the caller that school officials had defendant and his companions in sight and "had everything under control." (Rep. Tr. 12:2–7.) [3]

---

2. Franklin has experienced problems on campus in the past with violence and drug activity attributed to street gangs, some of whom are members of the student body. (Alimbini Decl. ¶ 3.) As a result, the school has taken steps to protect its student population. For example, the school district employs campus security monitors to work at Franklin with school officials to maintain order on campus and keep non-students off campus. (*Id.* ¶ 4.) The school district also has a police force, the Stockton Unified School District Police, to assist in keeping the school safe. (*Id.*) Franklin has also implemented a closed campus policy, which permits only students, faculty, and staff on school grounds between 6:30 a.m. and 4:30 p.m., unless permission is given by the school administration. (*Id.* ¶ 5.) In addition, Franklin is surrounded by fencing with signs posted around the school warning visitors that "trespassing and loitering around a school is forbidden by law," they are "subject to search," and "[n]o weapon [is] allowed on a public school." (*Id.*)

3. At the end of the conversation, the anonymous parent requested that Guiterrez inform her of the outcome and the two agreed on a follow-up phone call at 11:00 a.m. on the following day. (Rep. Tr. 13:2–7.) Guiterrez testified that she received a follow-up phone call the next day from the anonymous parent. (Rep. Tr. 13:21–24.) The parent inquired whether a story appearing in the local newspaper about a young man, who had been

Based upon the information relayed to Guiterrez from the caller, Hague had radioed all campus security personnel and assistant principals, advised them of the suspect's location on campus, and then headed to that location. (Rep. Tr. at 40:13–16.) At approximately 2:20 p.m., Assistant Principal Dorcas Alimbini ("Alimbini") responded to the radio call from Hague. According to Alimbini, Hague indicated that an anonymous caller, identifying herself as a concerned parent, had warned school officials that "a male Hispanic, short in stature, bald, wearing dark long shorts and a dark shirt," had flashed a weapon by lifting his t-shirt above his waist. (Alimbini Decl. ¶ 7.)

Alimbini and two campus security monitors, Anthony Davenport ("Davenport") and Brian Nauta ("Nauta"), visually located defendant with a group of young men near portable classrooms on the south side of the campus. (Rep. Tr. at 34:18–25; 35:2–12.) Nauta approached the group and recognized some of them as former Franklin students. (Id. at 58:2–9.) He began questioning the group and was soon joined by fellow security monitor Davenport and Stockton Unified School District Police Officer Gordo ("Officer Gordo"). Nauta and Davenport radioed back to Hague that the group had been located. (Rep. Tr. 56:1–5; 59:14–24.) Hague directed Davenport to "search" defendant. (Rep. Tr. 59:14–24.)

Davenport ordered defendant to place his hands on the wall of a portable classroom, but defendant initially failed to respond and, instead, began adjusting his shorts. (Rep. Tr. 59:14–25; 60:1–9.) After Davenport issued a second command, defendant complied by placing his hands

arrested carrying a weapon on campus, was the individual she had reported the previous day. (Id.) Guiterrez confirmed that the news story involved the same individual that the caller had seen. (Id.)

on the wall. (Id.) Davenport patted the outer clothing of defendant and discovered a 20–gauge, Harrington and Richardson shotgun in the waistband area of defendant's shorts.[4] (Id.) Officer Gordo took custody of the weapon and determined that it was loaded with one 20–gauge shotgun shell. (Id.) Defendant was subsequently arrested and charged with possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d).

## STANDARD

The Fourth Amendment protects the right of "people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The purpose of the Fourth Amendment is to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The Fourth Amendment applies to public school officials because such officials act as representatives of the State in carrying out searches and other disciplinary functions. *New Jersey v. T.L.O.,* 469 U.S. 325, 336–37, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). To determine whether a particular search is reasonable "depends on the context within which a search takes place," and requires "balancing the need to search against the invasion which the search entails." *T.L.O.,* 469 U.S. at 337, 105 S.Ct. 733 (quoting *Camara,* 387 U.S. at 536–37, 87 S.Ct. 1727).

## ANALYSIS

Defendant contends that the shotgun discovered in his waistband should be suppressed because it is the fruit of an unlaw-

4. The barrel of the shotgun and shoulder stock had been cut down to allow easier concealment of the weapon.

ful search and seizure in violation of the Fourth Amendment. Specifically, defendant argues that he was stopped without reasonable suspicion based upon an unreliable, anonymous tip and then improperly frisked without a warrant. The government responds that, in light of all the circumstances, the subject tip provided reasonable suspicion to stop and frisk the defendant.

### A. *Florida v. J.L.*

In *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), an anonymous caller to the Miami–Dade Police department reported that a black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. *J.L.*, 529 U.S. at 268, 120 S.Ct. 1375. Based solely upon this tip, two police officers arrived at the bus stop and approached a group of three black males, one of whom (the "defendant") wore a plaid shirt corresponding to the caller's description. *Id.* Although the officers did not see a firearm nor threatening or unusual movements by defendant, one of the officers commanded defendant to put his hands up, and then frisked him and seized a gun from his pocket. *Id.* Defendant was charged under state law with carrying a concealed firearm without a license and possessing a firearm while under the age of 18. *Id.*

The Florida Supreme Court held that the search violated the Fourth Amendment. *Id.* at 269, 120 S.Ct. 1375. The United States Supreme Court affirmed the Florida ruling based upon the unreliability of the anonymous tip that formed the sole basis for police suspicions of defendant. *Id.*

The Court described the tip as "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [defendant]." *Id.* At 271. In particular,

the anonymous tip "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* Because the officers' suspicion of defendant "arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller," the Court concluded that the officers' search of defendant was invalid under the Fourth Amendment. As discussed below, the present case can be distinguished from *J.L.* based upon significant differences in the physical setting and the circumstances surrounding the anonymous phone call.

### B. The School Setting

██ The Supreme Court, when applying the strictures of the Fourth Amendment, treats the public school setting as an enclave of lowered expectations of privacy because public school administrators have the heightened burden of providing a safe haven for students. *See T.L.O.*, 469 U.S. at 339, 105 S.Ct. 733. In *Florida v. J.L.*, the Court reaffirmed this principal by placing a key limitation on its holding and application, which directly applies to defendant's motion:

> The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability.
>
> .        .        .        .        .
>
> Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports and *schools,* cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.

*Id.* at 273–74, 120 S.Ct. 1375 (internal citations omitted) (emphasis added). Significantly, Justice Ginsburg's language does not refer to "students" but, instead, men-

tions only "schools." Clearly, the Court recognized that schools require heightened security and, thus, a diminished expectation of privacy. *See Vernonia Sch. Dist. v. Acton,* 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) ("Fourth Amendment rights ... are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children.").

In *New Jersey v. T.L.O.,* the Court recognized "the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." *T.L.O.,* 469 U.S. at 339, 105 S.Ct. 733. Justice White noted that this substantial interest had been heightened because violent crime in high schools had become a pervasive social evil. *See id.* His observation in 1985 foreshadowed the wave of high school gun violence in recent years, such as the slaughter of students at Columbine High School.

Based upon the substantial interest in furthering student safety, the Court in *T.L.O.* found that "maintaining security and order in the schools requires a certain degree of flexibility," and "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *T.L.O.,* 469 U.S. at 340, 105 S.Ct. 733. Thus, in balancing governmental and privacy interests on school campuses under the Fourth Amendment, the Court would permit a departure from the probable cause standard to conduct searches of *students* because such administrators must be given the freedom to maintain order. *See id.* at

341, 105 S.Ct. 733. A question here is whether such flexibility should extend to the non-student visitor to a school campus.

■ Defendant contends that his status as a non-student takes him outside the parameters of *T.L.O.* because that decision only addressed the relationship of administrators and students. However, the rationale in *T.L.O.* stems from the inherent authority and responsibility of school administrators to provide a safe environment for students. *T.L.O.* addresses that issue as it relates to the conduct of students, but that same need for a safe environment must surely encompass the conduct of non-students who pose a threat to that environment. Thus, to extend the *T.L.O.* standard to non-student visitors who present a credible threat of physical harm to students on campus would seem a small and logical step.[5] In short, the court finds that defendant's status as a non-student should not determine the response of school administrators to the threat of gun violence.

Defendant next argues that when school security confronts a non-student *whom they suspect is armed,* they should simply ask him to leave. Citing California Penal Code section 626.7, defendant contends Franklin security personnel were restricted to requesting defendant to leave the campus. Section 626.7 provides that a non-student entering a school campus may be asked to leave if it "reasonably appears" that "the person is committing any act likely to interfere with the peaceful conduct of the campus ..." Cal.Penal Code § 626.7(a); *In re Joseph F.,* 85 Cal. App.4th 975, 983–84, 102 Cal.Rptr.2d 641 (2000).[6] If the person fails to leave the

---

**5.** The court's determination to extend *T.L.O.* is supported by a finding of the California legislature: "[A] disproportionate share of crimes committed on school campuses are committed by persons who are neither students, school officials, or staff, and who have

no lawful business on the school grounds." Cal.Penal Code § 627(c).

**6.** Section 626.7 provides in relevant part:
If a person who is not a student, officer, or employee of a public school, and who is not required by his or her employment to be on

campus or returns to the campus, he is guilty of a misdemeanor. Cal.Penal Code §§ 626.7(a)(1)-(2).

■ Defendant's reliance on section 626.7 is misplaced because it ignores the plain meaning of the statute. Section 626.7 provides school officials with authority to exercise their *subjective* judgment to remove persons "likely to interfere with the peaceful conduct of the campus." Cal.Penal Code § 626.7(a); *see In re Joseph F.*, 85 Cal.App.4th at 983–84, 102 Cal.Rptr.2d 641.[7] The statute is not intended to limit school security personnel to a single response. Rather, it is designed to "afford[·] enough latitude to be able to stop someone on campus and ascertain basic information ... such as who the person is, why he or she is present and whether he or she has registered [with the school's front office], if required." *In re Joseph F.*, 85 Cal.App.4th at 984–85, 102 Cal.Rptr.2d 641.' The statute simply enables school administrators to size up a non-student visitor and, if he "reasonably appears" to be a potential troublemaker, to order him to leave the campus or face criminal charges. Section 626.7, however, does not *prevent* school officials from re-

sponding in a different manner should it prove necessary to protect students.

Clearly, school officials, when faced with the credible threat of gun violence, must have flexibility to respond in the manner most appropriate to protect the lives of students. Indeed, would any reasonable parent (which certainly includes the anonymous "concerned" parent here) send her child to Franklin High School if a suspected armed non-student could not be disarmed by school administrators? It simply defies common sense to tie the hands of administrators when they reasonably suspect a non-student visitor, armed with a "weapon," threatens the lives and safety of students. The court therefore finds the "degree of flexibility" required in the school setting made it incumbent upon Franklin administrators to promptly respond once defendant was reliably identified as the same person described by the caller. *See T.L.O.*, 469 U.S. at 340, 105 S.Ct. 733. Clearly, under such circumstances, a non-student visitor who is reasonably suspected to be armed, may be stopped and frisked based upon a level of suspicion short of probable cause.[8] The

---

the campus or any other facility owned, operated, or controlled by the governing board of that school, enters a campus or facility outside of the common areas where public business is conducted, and it reasonably appears to the chief administrative officer of the campus or facility, or to an officer or employee designated by the chief administrative officer to maintain order on the campus or facility, that the person is committing any act likely to interfere with the peaceful conduct of the activities of the campus or facility, or has entered the campus or facility for the purpose of committing any such act, the chief administrative officer or his or her designee may direct the person to leave the campus or facility. If that person fails to do so or if the person returns without following the posted requirements to contact the administrative of-

fices of the campus, he or she is guilty of a misdemeanor ...
Cal.Penal Code § 626.7(a).

7. The legislative intent of section 627 is expressed in the statute:
It is intent of the Legislature in enacting this chapter to promote the safety and security of the public schools by restricting and conditioning the access of unauthorized persons to school campuses and ... guarantee all students and staff ... [California's] inalienable constitutional right to attend safe, secure, and peaceful public schools.
Cal.Penal Code § 627(c).

8. It should be noted school officials did not identify defendant as a non-student until they actually approached to stop and frisk defendant.

issue, however, remains whether, in light of these exigent circumstances, the administrators possessed reasonable suspicion to stop and frisk defendant.

### C. Reliability of the Anonymous Parent's Tip

An anonymous tip can serve as the basis for reasonable suspicion, however, "[a]n anonymous tip standing alone does not demonstrate an informant's veracity or reliability because an anonymous tipster cannot be held accountable if he or she provides inaccurate information, and the police cannot assess the tipster's reputation." *United States v. Morales*, 252 F.3d 1070, 1074 (9th Cir.2001) (citing *J.L.*, 529 U.S. at 270, 120 S.Ct. 1375). Thus, "in order for an anonymous tip to have sufficient 'indicia of reliability' to serve as the basis for a *Terry*[9] stop, the tip must include a 'range of details,' and it must predict future actions by the suspect that are subsequently corroborated by the police." *Morales*, 252 F.3d at 1073–74 (quoting *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)).

At the outset, it is questionable whether all of the information relayed by the anonymous parent in this case can properly be characterized as a "tip." Here, the concerned parent provided school officials with ongoing, contemporaneous surveillance of the defendant with no hiatus in time between the parent's observations and the immediate corroboration by school security personnel. This contrasts sharply with the information provided to police in *J.L.*, which was an anonymous, uncorroborated prediction of conduct that was iso-lated in time and place from the subsequent observation of defendant by police.

■ However, assuming all of the information by the anonymous parent is a "tip," the information differed in numerous respects from the tip in *J.L.* and provided sufficient "indicia of reliability." First, the anonymous caller identified herself as a parent of a Franklin student. (Rep. Tr. 9:5–8.) Second, she disclosed that she was in her car at the close of the school day near the side entrance to the campus.[10] (Rep. Tr. 8:23–25; 9:1–13.) Third, she explained that she had personally observed the defendant as he walked by her car lift his t-shirt above the waist to reveal a weapon tucked into his shorts. (Rep. Tr. 8:23–25; 9:1–3.) Fourth, she insisted on anonymity because she was concerned that "a weapon might be coming on the campus." (Rep. Tr. 10:11–14.) Fifth, she described in great detail the physical appearance and clothing of defendant, which was immediately corroborated by school security personnel. (Guiterrez ¶¶ 3–4; Rep. Tr. 8:23–25; 9:1–3.) Sixth, she agreed to remain on the line while providing contemporaneous surveillance of defendant's movements, which, in turn, were also promptly corroborated by school security personnel. (Rep. Tr. 12:2–3.) Finally, she insisted that school officials inform her of the outcome of her report and arranged a follow-up phone call to the school the next day at 11:00 a.m. (such a call was made the following day). (Rep. Tr. 13:2–7.)

In sum, the first-hand, contemporaneous surveillance of the defendant by an anonymous school parent bears little resemblance to the tip in *J.L.*, which was "the

---

9. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

10. It is reasonable infer that the caller was waiting for her child and using her cell phone in making the call.

bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [defendant]." *J.L.*, 529 U.S. at 271, 120 S.Ct. 1375. Here, the anonymous parent's tip exhibited "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop" because the "tip" consisted of first-hand contemporaneous observations describing the suspect, his conduct and movements, which were promptly corroborated by Franklin school security personnel. *See Morales*, 252 F.3d at 1075, *J.L.*, 529 U.S. at 270, 120 S.Ct. 1375. Accordingly, the court finds that the anonymous parent's phone call was sufficient to support reasonable suspicion to conduct a stop and frisk of the defendant.

### D. Scope of the Stop and Frisk

"Determining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the ... action was justified at its inception,'; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733 (internal citation omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). As discussed above, the court has found the stop and frisk of defendant was justified at its inception because the anonymous parent's tip provided adequate reasonable suspicion.[11] The final issue is whether the frisk conducted by

Davenport was reasonably related in scope to the anonymous tip.

■ In this case, the caller specifically alleged that defendant was carrying a weapon in the waistband of his shorts. The scope of Davenport's search was confined to a frisk of defendant's outer clothing. Accordingly, the court finds that the frisk of defendant conducted by Davenport was reasonable in scope because it was restricted to the specific content of the tipster's allegation, it was directly related to the objective of the search, and was not excessively intrusive in light of defendant's age and gender. *See T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733.

### CONCLUSION

Based on the above analysis, the court finds that the 20–gauge, Harrington and Richardson shotgun discovered in defendant's possession was not the fruit of an unlawful search and seizure in violation of the Fourth Amendment. Accordingly, defendant's motion to suppress is DENIED.

IT IS SO ORDERED.

11. Defendant contends that the order to "search" sent over the radio by Franklin Principle Hague demonstrates that his Fourth Amendment rights were violated. However, the court construes Hague's order as a direction to security personnel to conduct a stop and frisk.