**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 20-4093

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

DEVON SCOTT COLEMAN, a/k/a Cuz, a/k/a Devin Scott Coleman,

       Defendant – Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Abingdon. James P. Jones, Senior District Judge. (1:18-cr-00025-JPJ-PMS-28)

Argued: September 24, 2021               Decided: November 9, 2021

Before NIEMEYER, AGEE, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Niemeyer and Judge Quattlebaum joined.

**ARGUED:** Michael Allen Bragg, Abingdon, Virginia, for Appellant. Jean Barrett Hudson, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Thomas T. Cullen, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

AGEE, Circuit Judge:

A federal grand jury indicted Devon Scott Coleman on three counts after a deputy sheriff with the Washington County Sheriff's Office ("WCSO") conducted an investigative stop and subsequently discovered a firearm and drugs, among other items, in his vehicle. Coleman moved to suppress those items and his attendant statements, arguing that the deputy did not have reasonable suspicion to perform the investigative stop. The district court denied that motion and, for the reasons that follow, we affirm.

I.

A.

As students were arriving at Patrick Henry High School in Washington County, Virginia, on the morning of Wednesday, September 20, 2017, a school administrator reported to the WCSO that an unknown man was parked erratically on the campus. The administrator described the man—later identified as Coleman—as "asleep or passed out" in his vehicle with a crossbow visible in the backseat. J.A. 38. Deputy Sheriff David Johnson of the WSCO, who primarily served as a school resource officer, was dispatched to the school to investigate. When he arrived on the campus, the school administrator identified the reported vehicle, a Pontiac Sunfire, in the student/faculty parking lot. The vehicle, which was stopped but running, was primarily parked in a travel lane, with the brake lights engaged and the front end partially positioned into a marked parking spot. The bulk of the vehicle sat in a travel lane.

2

Deputy Johnson later testified that he was immediately "concerned for the driver's safety, the school's safety; that is the students, the staff, the faculty. [The school administrator] mentioned a crossbow in the back of the vehicle, which was also a safety concern." J.A. 38. As for the crossbow, he believed its possession was illegal under Virginia Code section 18.2-308.1 because it could fire "a projected missile on the school campus." J.A. 53. As relevant here, by virtue of section 18.2-308.1 and its cross-reference to the weapons enumerated in section 18.2-308(A), Virginia law prohibited the knowing possession of certain weapons on school grounds.[1] Neither statute, however, expressly mentions crossbows.

Deputy Johnson pulled behind the vehicle, but when he opened the door of his police cruiser, Coleman began to drive away. Finding this behavior suspicious under the circumstances, Deputy Johnson engaged his emergency lights to then stop Coleman. When Deputy Johnson approached the vehicle after it came to a stop, he observed the butt of a

---

[1] In full, section 18.2-308(A) prohibits carrying the following weapons in a concealed manner:

> (i) any pistol, revolver, or other weapon designed or intended to propel a missile of any kind by action of an explosion of any combustible material; (ii) any dirk, bowie knife, switchblade knife, ballistic knife, machete, razor, slingshot, spring stick, metal knucks, or blackjack; (iii) any flailing instrument consisting of two or more rigid parts connected in such a manner as to allow them to swing freely, which may be known as a nun chahka, nun chuck, nunchaku, shuriken, or fighting chain; (iv) any disc, of whatever configuration, having at least two points or pointed blades which is designed to be thrown or propelled and which may be known as a throwing star or oriental dart; or (v) any weapon of like kind as those enumerated in this subsection[.]

Effective July 1, 2020, this statute was amended to replace "slingshot" with "sling bow."

3

crossbow in the backseat behind Coleman and noted that Coleman, who did not appear to be a student,[2] seemed lethargic. Deputy Johnson explained to Coleman that "[t]he school had contacted [the police] and the call had been made that [Coleman] was there on the school campus and they were concerned." J.A. 41. He then inquired whether Coleman had any weapons in the vehicle, and Coleman responded that he had a firearm in the vehicle's center console. Deputy Johnson asked Coleman to exit the vehicle "[f]or the safety of [himself], Devon Coleman, and all of the school students around [them]." J.A. 80. When Coleman stepped out of the vehicle, Deputy Johnson observed "a fairly large bag of a green leafy substance that appeared to be marijuana" in between the door and the driver's seat. J.A. 43.

Deputy Johnson administered Coleman a field sobriety test, while another deputy searched the vehicle. That search revealed marijuana, crystal methamphetamine, individual baggies, a scale, a Smith & Wesson .38 Special revolver, and the crossbow. Coleman was arrested immediately.

B.

A federal grand jury subsequently indicted twenty-eight defendants, including Coleman, for participating in a drug trafficking organization. Coleman was named in three counts: conspiring to distribute and possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and (b)(1)(C), 843(d), and 846 (Count 1); possessing with intent to distribute 50 grams or more of methamphetamine,

_____

[2] Coleman was thirty-nine years old at the time of the offense.

4

in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) (Count 16); and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 17). Coleman moved to suppress the evidence recovered from his vehicle and any attendant statements, arguing that Deputy Johnson did not have reasonable suspicion of criminal activity to conduct an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968), because possession of a crossbow on school grounds is not illegal under Virginia law.

The Government countered that Coleman could have been committing various criminal activities—e.g., a parking violation, unlawfully operating a vehicle, trespassing, or possessing a crossbow on school grounds—all of which created reasonable suspicion to support the investigative stop. With regard to the crossbow, the Government argued that Deputy Johnson had reasonable suspicion because, although section 18.2-308(A) does not expressly identify crossbows, Coleman's possession of one was nonetheless illegal as the statute broadly prohibits "weapon[s] of like kind," and crossbows so qualify. And even if Deputy Johnson was mistaken in his belief that crossbows are forbidden on school property under that statute, the Government posited that his mistake of law was a reasonable one under *Heien v. North Carolina*, 574 U.S. 54 (2014), meaning it did not undercut the conclusion that he had reasonable suspicion.

After an evidentiary hearing, during which the district court heard testimony from Deputy Johnson and viewed footage from his dashcam, it denied Coleman's motion to suppress. The court found that Deputy Johnson had reasonable suspicion that Coleman was engaged in criminal activity because he

arrived at the school with information that an individual was sleeping in a car parked on school campus with a crossbow. He had received this information from a reliable source—the dispatcher and a school official—and the information was corroborated when the assistant principal identified Coleman's vehicle in the school parking lot. Moreover, the vehicle was parked in a somewhat erratic manner, and its driver began to drive away immediately upon Deputy Sheriff Johnson's arrival. Particularly in light of the fact that these events transpired on a school campus when students and teachers were present, they give rise to an objectively reasonable suspicion that Coleman was committing a crime, namely, possessing a weapon on school property. It is no matter that a crossbow may not be a prohibited weapon under the relevant Virginia statute. Even assuming that Deputy Johnson's belief that a crossbow was a prohibited weapon was mistaken, such a mistake was objectively reasonable.

J.A. 94 (footnote omitted).

Coleman proceeded to trial, and a jury convicted him on all three counts.[3] The court sentenced him to 211 months' imprisonment. Coleman timely appealed.

We have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291, and review the denial of a motion to suppress de novo as to the district court's legal conclusions and for clear error as to its underlying factual findings. *United States v. Kolsuz*, 890 F.3d 133, 141–42 (4th Cir. 2018). "When, as here, a motion to suppress has been denied, we view the evidence presented in the light most favorable to the government." *United States v. Watson*, 703 F.3d 684, 689 (4th Cir. 2013).

---

[3] For Count 1, the jury found him accountable for 50 grams or more of methamphetamine rather than the 500 grams or more alleged in the indictment.

6

On appeal, Coleman challenges the validity of the investigative stop, arguing that Deputy Johnson did not have reasonable suspicion that he was engaged in criminal activity because possessing a crossbow on school property is not illegal under Virginia law and, in any event, Deputy Johnson's mistake of law on that point was unreasonable. However, we need not reach these arguments. Even if Coleman had not possessed the crossbow, the totality of the remaining circumstances nonetheless provided Deputy Johnson with reasonable suspicion to conduct the investigative stop. Alternatively, we reach the same conclusion when considering Coleman's crossbow possession in our analysis, assuming, without deciding, in that scenario that Virginia law does not prohibit possession of a crossbow on school property. Accordingly, we affirm the district court's denial of Coleman's motion to suppress.

A.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. In *Terry*, the Supreme Court recognized that an officer may stop and search a person without probable cause in limited circumstances. The Court instructed that to justify such an investigative stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant . . . intrusion." *Terry*, 392 U.S. at 21. In other words, the officer must "observe[] unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Id.* at 30. The Court employed an objective standard on this inquiry: "[W]ould the facts available to the officer at the moment of the

seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21–22 (internal quotation marks and citation omitted).

Applying *Terry*, we have since held that "[a]n officer may stop and briefly detain a person 'when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *United States v. Montieth*, 662 F.3d 660, 665 (4th Cir. 2011) (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985)). "[A] court must look to the totality of the circumstances in determining whether the officer had a particularized and objective basis for suspecting criminal activity." *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011). "Because reasonable suspicion is an objective test, we examine the facts within the knowledge of [the officer] to determine the presence or nonexistence of reasonable suspicion; we do not examine the subjective beliefs of [the officer] to determine whether he thought that the facts constituted reasonable suspicion." *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

Of course, "[w]hile such a detention does not require probable cause, it does require something more than an 'inchoate and unparticularized suspicion or "hunch."'" *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) (quoting *Terry*, 392 U.S. at 27). At the same time, as the Supreme Court has explained, "[t]he reasonable suspicion inquiry falls considerably short of 51% accuracy." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (internal quotation marks omitted).

## B.

We are convinced that, even if Coleman had not possessed the crossbow, Deputy Johnson would have had reasonable suspicion to conduct an investigative stop. This is

8

because a reasonable officer could conclude based on the totality of the circumstances that Coleman was engaged in various unlawful activities, namely, trespassing on school grounds, commission of a parking violation, and unlawfully operating a vehicle under the influence.

Removing the crossbow from the calculation, Deputy Johnson, who primarily served as a school resource officer, was dispatched to the high school to investigate a school administrator's report to law enforcement that, as students were arriving that morning, a sleeping or unconscious unidentified man (who was plainly a non-student) was parked erratically in the school parking lot. This setting is a factor in evaluating the stop.

The fact that school grounds constituted the location of the unknown individual's suspicious activity would immediately heighten a reasonable officer's concern, particularly that of a school resource officer. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); *see also Gonzalez v. Huerta*, 826 F.3d 854, 858 & n.7 (5th Cir. 2016) (recognizing the sensitivity of responding to reports of suspicious activity at a school by citing officers' remarks that "[their] job is a little bit different . . . . [they've] got kids [t]here, . . . so [they] have to approach a little bit different"). Indeed, those concerns are apparent in how courts apply the Fourth Amendment in the school setting even as to students. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995) ("Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children."); *New Jersey v. T.L.O.*, 469 U.S. 325,

9

340 (1985) (reasoning that "maintaining security and order in the schools requires a certain degree of flexibility" and that "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject").

One such safety concern is the presence of an unidentified individual on a school campus. The School Visitors Policy for Washington County Public Schools, which includes the school here, directs that "[u]pon arriving at a school, all visitors must report to the administrative office"; "[u]nauthorized persons who fail to leave the school grounds . . . as requested will be considered trespassers" in violation of Virginia Code section 18.2-128; and "[l]aw enforcement may be called to enforce this policy." *See* School Visitors, Washington Cnty. Public Schools (last revised Aug. 2, 2021), https://go.boarddocs.com/vsba/wcps/Board.nsf/files/C5SLS457E536/$file/KK%208-2-2021%20approved%208-2-2021%20FAS.pdf; *see also* Va. Code Ann. § 18.2-128(B) ("It shall be unlawful for any person . . . to enter upon or remain upon any . . . school property in violation of (i) any direction to vacate the property by a person authorized to give such direction or (ii) any posted notice which contains such information, posted at a place where it reasonably may be seen.").

School administrators wield broad authority in ensuring compliance with such policies and statutes. *Cole v. Buchanan Cty. Sch. Bd.*, 328 F. App'x 204, 209 (4th Cir. 2009) (unpublished) ("School officials have broad authority and responsibility for assuring that individuals conduct themselves appropriately while on school grounds. A school board's authority encompasses the authority to remove or bar from entry an individual who threatens the safety of students or staff, or who disrupts the orderliness of the educational

10

process." (citations omitted)). Accordingly, even if the school administrator's report alone would not have permitted a *Terry* stop, police may arrive on scene to a report of an unauthorized individual and unusual activity on school grounds—and indeed, respond appropriately when they do so. This factor is properly considered as part of the totality of the circumstances informing Deputy Johnson's conduct. *See Walker v. Donahoe*, 3 F.4th 676, 685 (4th Cir. 2021) ("The 911 call about [the defendant walking with an assault rifle in the general direction of a school]—though insufficient alone to create reasonable suspicion—substantiates the perception that something was amiss.").

The circumstances Deputy Johnson encountered upon arriving at the school reinforced the "unusual and alarming" nature of Coleman's presence on the campus. *Id.* at 685–86. After Deputy Johnson arrived and the school administrator identified Coleman's vehicle, Deputy Johnson observed that the vehicle, which was running and had its brake lights engaged, was haphazardly positioned and impeding a travel lane. Deputy Johnson's initial on-scene observations thus added to his calculation that something was awry. *See Flores v. City of Palacios*, 381 F.3d 391, 402–03 (5th Cir. 2004) (holding that a vehicle parked on the wrong side of a two-way street in violation of Texas law supported reasonable suspicion).

After pulling his police cruiser behind the vehicle, Deputy Johnson opened his door to exit, but Coleman started to drive away. This, too, understandably aroused Deputy Johnson's suspicion because such a maneuver is often considered evasive. *See United States v. Bumpers*, 705 F.3d 168, 176 (4th Cir. 2013) (considering the defendant's "evasive activity" of "leaving the premises at a 'quick pace'" in a reasonable suspicion analysis

11

where the officer believed the defendant was trespassing); *United States v. Lyles*, 946 F.2d 78, 80 (8th Cir. 1991) (considering, in a reasonable suspicion analysis, the fact that "[w]hen the officers stopped behind the [defendants'] car and turned on the flashing red lights, the car began to drive away") (cited with approval by *United States v. Smith*, 396 F.3d 579, 586 (4th Cir. 2005)). Given the totality of the circumstances, Deputy Johnson initiated his emergency lights to conduct an investigative stop. At that point, he was "concerned for the driver's safety, the school's safety; that is the students, the staff, the faculty." J.A. 38.

These facts are sufficient to support a finding of reasonable suspicion for an investigative stop because a reasonable officer could suspect that Coleman was trespassing on school grounds, in violation of the school board policy and Virginia Code section 18.2-128(b). Quite simply, Deputy Johnson acted appropriately "to investigate why [Coleman] was at the HS" under the circumstances. *United States v. Hewlett*, 471 F. Supp. 3d 724, 742 (E.D. Va. 2020) (finding an officer had reasonable suspicion to stop the defendant where the officer believed the defendant was trespassing on school grounds because "a suspicious black vehicle, later identified as the defendant's vehicle, was circling the senior parking lot at the HS on the morning of a school day without dropping off any student, . . . the same male driver had picked up an underage female from the HS the previous day[,]" and the defendant looked around nervously for an exit upon seeing the officer). On this basis, Deputy Johnson possessed reasonable suspicion to conduct the investigative stop of Coleman.

We also note that the circumstances of Coleman's presence on the school campus suggested other illegal activity. For instance, given Coleman's markedly lopsided parking,

12

a reasonable officer could determine that Coleman was committing a parking violation. *See* Washington Cnty. Code § 38-68(a) ("No person shall stand, stop or park a vehicle on any county-owned or county-leased property except within properly marked and designated parking spaces in compliance with all authorized signs or markings posted on such property."). Moreover, a reasonable officer could suspect that Coleman was unlawfully operating his vehicle under the influence, as he remained "asleep or passed out" during the bustling morning hours at the school. J.A. 38; *see* Va. Code Ann. § 18.2-266 ("It shall be unlawful for any person to drive or operate any motor vehicle" while under the influence of alcohol or drugs.). In addition to trespassing, these activities also support a finding of reasonable suspicion, as "[n]othing in the Fourth Amendment renders modest measures in the enforcement of modest infractions impermissible." *Bumpers*, 705 F.3d at 174. Accordingly, we conclude that Deputy Johnson had reasonable suspicion to conduct the investigative stop of Coleman even without considering the presence of the crossbow.

C.

Alternatively, we would reach the same conclusion even if we were to consider Coleman's crossbow possession, whether in isolation or as part of the totality of the circumstances. That is to say, a reasonable officer could conclude that, though it may have been lawful, Coleman was in possession of a dangerous weapon on school grounds, which could be used to harm students, faculty, and/or staff at the school.

In this alternative analysis, the legality of Coleman's crossbow possession under the Virginia statute is largely tangential to the question of whether Deputy Johnson's suspicion was reasonable. In fact, as noted below, we assume arguendo that his possession of the

13

crossbow was not unlawful. So we turn to the facts in *Terry* as instructive on this point to demonstrate how even seemingly innocent conduct can sometimes support reasonable suspicion of criminal activity. There, an officer observed two men taking turns to "look[] in a store window, then walk[] on a short distance, turn[] around and walk[] back . . . , pausing once again to look in the same store window." *Terry*, 392 U.S. at 6. The men conferred with each other, as well as briefly with a third man, and then walked away together after about "10 to 12 minutes" of "pacing, peering and conferring." *Id.*

The officer "testified that after observing their elaborately casual and oft-repeated reconnaissance of the store window . . . , he suspected the two men of 'casing a job, a stick-up,' and that he considered it his duty as a police officer to investigate further." *Id.* He was, however, concerned that they may have had a firearm. *Id.* He followed the pair until they reunited with the third man and then intervened. *Id.* at 6. "At this point [the officer's] knowledge was confined to what he had observed. He was not acquainted with any of the three men by name or by sight, and he had received no information concerning them from any other source." *Id.* at 7. The officer asked for their names and, after the men "mumbled something" in response, he grabbed one (Terry) and "patted down the outside of his clothing," which revealed a firearm. *Id.* The officer patted down the other two men and discovered a second firearm on one of them. *Id.*

In subsequent criminal proceedings for unlawfully carrying concealed weapons, Terry and his codefendant moved to suppress the firearms. *Id.* at 7–8. The state trial court denied the motion, the Ohio Court of Appeals affirmed, and the Supreme Court of Ohio dismissed the appeal. *Id.* at 8. On writ of certiorari, the Supreme Court affirmed. *Id.* The

Court explained that the officer's detention of the men was justified under the circumstances.

> [The officer] had observed Terry, Chilton, and [the third man] go Through [sic] a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation. There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further.

*Id.* at 22–23.

Applying the same approach here, just as the *Terry* defendants' "pacing, peering and conferring," *id.* at 6, near a storefront was hardly criminal in and of itself, we assume for the purposes of our alternative analysis that neither Coleman's crossbow possession nor any of the other individual circumstances was necessarily illegal. Here, as in *Terry*, the underlying behavior does not have to be illegal for us to conclude that Deputy Johnson had reasonable suspicion to stop Coleman. *See United States v. Slocumb*, 804 F.3d 677, 682 (4th Cir. 2015) (recognizing that "factors 'susceptible to innocent explanation' individually may 'suffice[] to form a particularized and objective basis' when taken together" (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (alteration in original))). Rather, we concern ourselves with determining whether criminal activity was afoot based on those

15

innocent underlying facts.[4] *Foster*, 824 F.3d at 94 (directing courts to "combine all of the factors supporting reasonable suspicion to consider the totality of the circumstances—the whole picture." (citation and internal quotation marks omitted)).

To identify the criminal activity at issue here, we return to the facts, which illustrate that an officer in Deputy Johnson's position could reasonably suspect that Coleman presented a credible threat of physical harm to students, faculty, and/or staff at the school by possessing a dangerous weapon. In doing so, we incorporate the facts discussed above, but factor in Coleman's crossbow possession to our reasonable suspicion calculation, the

---

[4] Even if we turned to the legality of Coleman's crossbow possession, we would not need to decide whether it fell within the scope of Virginia's statute prohibiting weapons on school grounds. Instead, we would readily conclude that Deputy Johnson's belief that the crossbow violated state law was a reasonable mistake under *Heien*. Therefore, it would not undermine the conclusion that he had reasonable suspicion of criminal activity.

Under *Heien*, an officer's mistake of law may be reasonable if the law is ambiguous, such that reasonable minds could differ on the interpretation, or if it has never been previously construed by the relevant courts. 574 U.S. at 67–68. Although Virginia appellate courts have provided a framework for interpreting the relevant statutory phrase—a "weapon of like kind as those enumerated in" section 18.2-308(A)—they have yet not had the occasion to consider that framework with regard to crossbows. And reasonable minds could differ on whether the phrase encompasses crossbows. For instance, crossbows bear resemblance to at least one weapon enumerated in the statute: slingshots. It could thus be argued that crossbows should be included as a like-kind weapon to a slingshot. On the other hand, it could be argued that they should be excluded based on their dissimilarity with most of the other listed weapons. Considering the lack of direction from Virginia's appellate courts on this specific inquiry and that reasonable minds could differ on the "like kind" phrase's application, it is unsettled whether a crossbow falls within the statute's scope. Even if we engaged in a full analysis and concluded that a crossbow falls outside the statute—a holding we do not make today—we would nonetheless find under *Heien*, that Deputy Johnson had reasonable suspicion because his belief that Coleman's crossbow was prohibited on school property was a reasonable, even if mistaken, assessment of the scope of section 18.2-308(A).

totality of which led Deputy Johnson to initiate an investigative stop. These circumstances support a finding of reasonable suspicion.

We again note the suspicion that looms large as to unknown individuals and attendant, peculiar behavior in the school setting. This suspicion drastically increases when, as here, that unknown individual possesses a dangerous weapon. And a crossbow is a dangerous weapon in the lay sense—whether possessed legally or otherwise—capable of inflicting serious, even fatal, injury. *Crossbow*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/crossbow (last visited Aug. 6, 2021) (defining it as "a weapon for shooting quarrels and stones that consists chiefly of a short bow mounted crosswise near the end of a stock"); *United States v. Gallaher*, 275 F.3d 784, 794 (9th Cir. 2001) (describing a crossbow as "a dangerous weapon"); *see also* J.A. 68–69 ("[T]his was not a kid's bow and arrow. This is a dangerous weapon. . . . And, you know, you shoot deer with it, and bear, and other human beings."). As Deputy Johnson testified, "[I]t would be concerning to [him] if there was someone with a crossbow asleep that doesn't belong in the parking area where students are coming." J.A. 53. The district court echoed similar concerns, stating,

> [I]s there anybody in this room who didn't applaud the officer for exactly what he did at a public school to check out . . . what was going on with some person, some adult sleeping in a car with a crossbow as . . . people [were] arriving at school. . . . [I]f something terrible, in fact, had happened and the officer told the newspapers, well, I had all that information, but . . . there was nothing I could do. . . . When [Coleman] drove away, I just had to let him go. Wouldn't we all be aghast?

J.A. 71.

17

In short, we conclude that Deputy Johnson took appropriate measures to protect the student, faculty, and staff at the school by investigating Coleman's crossbow possession. That factor served to increase the "unusual and alarming" nature of Coleman's presence in the school parking lot, and therefore contributed to Deputy Johnson's reasonable suspicion that some criminal activity could be afoot. *Walker*, 3 F.4th at 685–86 (concluding that reasonable suspicion for an investigatory stop existed where a 911 call alerted an officer to the defendant, who was dressed in quasi-military clothing and walking in the general direction of a school while in possession of an AR-15-style assault rifle the week after a mass school shooting); *United States v. Aguilera*, 287 F. Supp. 2d 1204, 1206–07, 1210 (E.D. Cal. 2003) (finding reasonable suspicion where, following a parent's report to school administrators that she observed an unknown man on the school's campus with a firearm hidden under his shirt, school administrators, security monitors, and an officer conducted an investigative stop and subsequently discovered a shotgun); *see also Terry*, 392 U.S. at 15 (remarking that the Fourth Amendment should not be utilized in a "rigid and unthinking" manner that would "exact a high toll in human injury and frustration of efforts to prevent crime"). In doing so, we invoke *Aguilera*'s apt appraisal of public officials' responsibility to protect schoolchildren using their discretion and good sense:

> [S]chool officials, when faced with the credible threat of [weapon] violence, must have flexibility to respond in the manner most appropriate to protect the lives of students. Indeed, would any reasonable parent . . . send her child to [school] if a suspected armed non-student could not be disarmed by school administrators? It simply defies common sense to tie the[ir] hands . . . when they reasonably suspect a non-student visitor, armed with a "weapon," threatens the lives and safety of students.

287 F. Supp. 2d at 1210.

18

Accordingly, based on our alternative analysis, we conclude that Deputy Johnson had reasonable suspicion to conduct an investigative stop of Coleman. We therefore affirm the district court's denial of Coleman's motion to suppress.

## III.

For the reasons discussed above, the judgment of the district court is

*AFFIRMED.*

19